**IN RE: Austin Chidi FELIX, Dorothy Ify Felix, Debtors.**

**Clyde Hardesty, Trustee, Plaintiff,**

**v.**

**City Medical Nursing Center, LLC, et al., Defendants.**

**Case No. 15–50016**
**Adv. No. 16–2060**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

September 12, 2017

Larry J. McClatchey, Stephanie P. Union, Columbus, OH, for Plaintiff.

John E. Breen, Columbus, OH, for Defendants.

Austin Chidi Felix, Reynoldsburg, OH, pro se.

Dorothy Ify Felix, Reynoldsburg, OH, pro se.

## MEMORANDUM OPINION AND ORDER (DOC. NO. 1)

Charles M. Caldwell, Judge

In this Memorandum Opinion and Order, the Court issues findings of fact and conclusions of law concerning the administration of assets through the extraordinary means of substantive consolidation. The goal is to combine a non-debtor entity into this bankruptcy proceeding, which Austin Chidi and Dorothy Ify Felix filed nearly three years ago (Debtors). The Chapter 7 Trustee, Clyde Hardesty (Plaintiff), filed this adversary proceeding, and the Defendants include, City Medical Nursing Center, LLC (LLC), Brian Felix (Brian), and his parents, the Debtors. The Court published an exhaustive history of the parties, their connections and prior disputes (*In re Felix*, 562 B.R. 700 (Bankr. S.D. Oh. 2017). A review of that Opinion provides context for the current litigation. Further, in a related adversary proceeding commenced by the United States Trustee, the Court revoked Debtors' discharge on January 6, 2017 (*McDermott v. Felix*, Adv. No. 16-2033). In the interest of brevity, however, the Court limits the present discussion to those factors directly relevant to substantive consolidation.

We start with June 2, 2003, the day the LLC became a domestic limited liability company under Ohio law. This business is located at 5340 E. Main Street, Ste. 209, Columbus, Ohio 43213. The Debtor, Dorothy Ify Felix, who is an Ohio licensed practical nurse, was the incorporator. Through the LLC, Mrs. Felix provides home health nursing services, and her spouse, Austin Chidi Felix, functions as manager. They both serve as employees of the LLC. After operating the LLC for nearly a decade, however, Debtors now claim they sold the business to their Son Brian on December 31, 2012. Approximately two years later on January 2, 2015, the Debtors filed their bankruptcy petition under Chapter 7 of the United States Bankruptcy Code (Code). The bankruptcy filing unmasked a maze of businesses, financial transactions and family ties so complex, that the Plaintiff now seeks substantive consolidation, as the only practical means to provide a potential recovery for creditors. 11 U.S.C. § 105(a). Plaintiff targets income generated by the LLC. That is the sole purpose of this litigation, as well as the primary source of recompense for creditors asserting claims that total $861,489.06.

Substantive consolidation is an extraordinary equitable remedy, and an alternative to avoidance actions and other more specific measures to corral and distribute assets. *Paris v. Walker, et al. (In re Walker)*, 566 B.R. 503, 532 (Bankr. E.D. TN. 2017). By dissolving corporate, partnership, and individual legal boundaries, bankruptcy courts pool separately held assets, and distribute proceeds to a newly combined creditor body. *Spradlin v. Beads and Steeds Inns, LLC (In re Howland)*, 674 Fed.Appx. 482, 487–90 (6th Cir. 2017).

As an equitable remedy exclusively available to bankruptcy courts, substantive consolidation eclipses state law remedies (corporate veil theory), that bypass structural formalities for the limited purpose of holding shareholders personally liable for corporate misdeeds. *Id.*

In view of the breadth of substantive consolidation, plaintiffs must prove ". . . substantial identity between the debtor and the target." *In re Walker* at 531. This requires evidence of the disregard of corporate boundaries, failure to respect joint ownership interests, or dominion over assets to the exclusion of all stakeholders. *Id.* In addition, courts require proof of disarray so substantial that a debtor's creditors benefit more through substantive consolidation, compared to any potential harm to the subject and its separate creditors. *Id.* The subject of substantive consolidation or its creditors also have an obligation to quantify their potential injury. *Id.*

With this setting in mind, Plaintiff targets the LLC purportedly sold by the Debtors to their Son, Brian. Actually, there are two sale agreements- both dated December 31, 2012- but in different amounts ($1,000.00/$6,000.00). Brian does not know which agreement he signed first, but testified that he intended to follow only the $6,000.00 agreement. In any event, both "contracts" appear as poorly prepared and sloppily executed form documents. Indeed, Mrs. Felix testified that they found at least one of the contracts on the Internet.

Considering first the 3–page Agreement for $1,000.00, it covered a sale from a "City Medical Nursing Services, LLC" to "City Medical Nursing Services, LLC", and referred to an attached list of assets ("Exhibit A") with no assigned value. The list included, 1) inventory, 2) work in process, 3) fixed assets (not listed "below" as sug-

gested), 4) customer lists, 5) a 2012 Lexus SUV, and 6) computers and office equipment. First, note that the name of the entity sold varies slightly from our target LLC by substituting the word "Services" for "Center". Second, it is a mystery why a "City Medical Nursing Services, LLC", would sale itself- to itself. Third, at least according to the Debtors' Amended Statement of Financial of Affairs filed on April 29, 2016, "City Medical Nursing Services, LLC", formed on July 25, 2012, is a separate corporate entity from the LLC at issue. However, it is also located at 5340 E. Main Street, Columbus, Ohio 43213, but in a different suite on the same floor.

Turning to the other sale Agreement for $6,000.00, the parties also used the December 31, 2012, date, but this time, the transfer is from the LLC to Brian. According to this 17–page Agreement (Page 16 is missing), the LLC provides home health care services under the operating name, "City Medical Nursing Services LLC". Brian does not recall what was on the missing page, or even signing either of the Agreements. In any event, the catalyst for this additional document remains ambiguous. It could be an effort to right the wrongs in the other "sale", but in any event, we do know for sure it cost Brian an additional $5,000.00. Specifically, the price was $1,000.00 down, with the balance payable by an "attached" promissory note referenced in Paragraph 8 of this Agreement. However, Plaintiff never received a copy of a note, it is not "attached" to the Agreement, and there is no other credible proof of payment.

Looking at this longer Agreement for further detail, we find that the purchaser became responsible for paying all taxes (Paragraph 9). However, Brian testified he thought the sale proceeds extinguished the tax obligation. Defying logic, under Paragraph 10.y., the seller remained as an own-

er of the business for one year, and after that, subject to agreement, continued on as an employee. Brian testified, however, that he never formally offered employment to the Debtors. The seller also retained authority to drive the company vehicle for the length of their tenure (Paragraph 16.-h.). Further, the sale covered all of the LLC's assets, including equipment, inventory, sales, contractual interests, books records and files, trademarks and trade names, and goodwill, including the business name, all without any assigned value (Paragraph 1.a.i.–vii). Finally, under this more detailed Agreement, the purchaser did not assume the liabilities, which remained a seller indemnification obligation (Paragraphs 35 and 36). As a result, the LLC's creditors presently have no recourse to its assets, absent substantive consolidation.

Regarding both Agreements, Brian testified that he did not know how much money the LLC made in 2012. In addition, he was not aware of an outstanding secured loan in the name of the LLC originally for $70,400.00, and owed to The Huntington National Bank (Huntington). The Debtors obtained this loan for the LLC on April 16, 2009, guaranteed by both. According to the Debtors' amended schedules filed on April 29, 2016, approximately $50,000.00 remained due on this loan. However, after the alleged sale, in which the purchaser did not contractually assume the liabilities, the LLC continued to pay the loan. Further, Brian testified that his Mother continued to work for the LLC, providing health care services and billing, while his Father, continued handling the LLC's finances. Most significantly, Brian testified that immediately after signing the sale documents, he moved to Houston, Texas for approximately a year. There he attended a technical college. Brian testified that during this time, the Debtors continued to run the LLC. Final-

ly, Brian testified that currently he does not handle the accounting, regularly review the LLC's financial records, or prepare its payroll. This pattern, of at best indifferent behavior, casts doubt on the existence of a true sale.

Adding even further doubt, Mr. Felix testified that from 2004–2012 he was the chief operating officer for the LLC, and confirmed that he still works for and handles financial matters for the LLC. Post sale, Mr. Felix remains a guarantor on the loan from Huntington, and he testified that between 2013 and 2015, the LLC was the only source of income for his family. After the alleged sale, the parties continued to use for identification purposes, the LLC's same employer tax number. Mr. Felix testified he called the Internal Revenue Service to change the number, but could not recall the details. Mr. Felix further confirmed that Mrs. Felix still provides medical care and billing for the LLC. Mrs. Felix corroborated this testimony. Indeed, she described herself as an "administrator" for the LLC.

In addition to this testimony, the Court reviewed written documentation in the form of tax returns, financial statements, and bank records. The tax returns close in time to the sale transactions especially shed light on the true value of the LLC at the time of the alleged sale. Further, the tax returns underscore the significant income stream derived by Debtors from the LLC. All this information further casts doubt on whether there was a genuine transfer to Brian.

For example, take the calendar year of the purported sale (2012). The Schedule C (Profit or Loss From Business) attached to the Debtors' 2012 tax return discloses that the LLC brought in gross receipts or sales of $1,133,967.00. For 2012, the Debtors reported wage and business income from

the LLC of $82,260.00 and $39,170.00, respectively. In 2013, a year after the sale, the Debtors continued to include a Schedule C with their return, that showed gross receipts or sales of $977,697.00 from the LLC. In 2013, the Debtors further reported wage and business income from the LLC of $99,040.00 and $1,381.00, respectively. It was not until nearly two years after the claimed sale that the Debtors' 2014 tax return finally did not include a Schedule C for the LLC, and only listed wage income from the LLC of $64,334.00. Likewise, for 2015, the Debtors' tax return had no Schedule C, but listed wage income of $121,667.00 for the Debtors- all from the LLC.

Turning to Brian's tax returns from the same period, for 2014 he filed a Schedule C in the name of a "City Medical Nursing Services, LLC", rather than the LLC in this litigation, and used the address of the tax preparer for that entity. On the 2014 Schedule C, Brian disclosed gross receipts or sales of $770,297.00. In addition, although Brian described himself as a "Student", he listed wage income from "City Medical Nursing Services, LLC", of $50,000.00 and a business loss of $17,806.00. For 2015, Brian filed a Schedule C again for a "City Medical Nursing Services, LLC" again using the tax preparer's address. On the 2015 Schedule C, Brian listed gross receipts or sales of $1,144,765.00. Again, Brian described himself as a "Student", and listed wage income from a "City Medical Nursing Services, LLC" of $18,000.00 and business income of $4,403.00.

With all this tax return information in mind, four themes emerge. First, the LLC's corporate gross receipts or sales reported from 2012–2015 are substantial including, 1) 2012 ($1,133,967.00), 2) 2013 ($977,697.00), 3) 2014 ($770,297.00), and 4) 2015 ($1,144,765.00). Combining just these

four years amounts to $4,026,726.00 in corporate gross receipts or sales. The heft of these numbers renders the business sale price ($1,000.00/$6,000.00), woefully inadequate. This of course depends upon which version of the sale agreement you measure. Second, on the assumption of a genuine sale of the LLC on December 31, 2012, Debtors in their 2013 tax return still filed a Schedule C for the LLC as the owners. Third, it was not until 2014 and then 2015 that the purported purchaser, the Debtors' Son Brian, filed a Schedule C to report corporate gross receipts or sales. For both years, Brian listed himself as a "Student", claimed that the corporate income emanated from a different entity, "City Medical Nursing Services, LLC", and used the address of the tax preparer for that entity.

Fourth, after the two purported sales on December 31, 2012, Debtors clearly remained active in the business, and disclosed substantial wage income from the enterprise. The amounts include, a. 2013 ($99,040.00), b. 2014 ($64,334.00), and c. 2015 ($121,667.00). For the three-year period, these amounts total $285,041.00. Again, the consideration for the purported sale pales in comparison to this sum. It is readily apparent that after the putative sale to their Son Brian, the Debtors continued their prior roles as manager and nurse, maintaining their oversight and control over the enterprise.

Turning to the profit and loss statements for the same period as the tax returns (2012 to 2015), the financial statements reflect the same level of gross receipts or sales reported on the returns. The statements, however, are in the name of another entity, again a "City Medical Home Health Nursing Services, LLC". The imprecise and inconsistent use of the names of various entities is an abiding hallmark of this case. It is a constant source of confu-

sion, and contributes to the difficulty of understanding transactions for pursuit of fraudulent conveyance litigation- the standard and less extraordinary alternative to substantive consolidation now sought by Plaintiff.

To illustrate, years after filing bankruptcy and after multiple amendments, the Debtors finally disclosed they formed twenty different entities, registered trade names and non-profits, including five in Maryland, one in the District of Columbia, and 14 in Ohio. *In re Felix*, 562 B.R. at 704. Fifteen of the entities bear similar names and/or otherwise indicate the provision of home health nursing services. They include multiples and variations on the "City Medical" theme, complete with different addresses. For example in Maryland and the District of Columbia, 1) City Medical Home Health Nursing Services Inc. (Lanham, MD.), 2) City Medical Home Health Nursing Services, Inc. (Upper Marlboro, MD.), 3) City Medical Nursing Care Services LLC (Upper Marlboro, MD.), 4) City Medical Nursing Care Services (Upper Marlboro, MD.), and 5) City Medical Nursing Care Services, Inc. (Washington, D.C.). Then continuing with the "City Medical" theme, but moving to Ohio, we have, 6) City Medical Nursing Services LLC (Columbus, OH.), 7) City Medical Nursing Services (N. High St., Columbus, OH.), 8) City Medical Nursing Services (E. Main St., Columbus, OH.), 9) City Medical Home Care Services (Columbus, OH.), and 10) City Medical Nursing Center, LLC (Columbus, OH.).

Next there is a "Central Ohio" theme, including, 11) Central Ohio Home Care Agency LLC (Columbus, OH.), 12) Central Ohio Home Care Agency (Columbus, OH.), and 13) Central Ohio Home Care Nursing Services, Inc. (Columbus, OH.). At last, we find two strays, 14) Winners Homecare, LLC (Columbus, OH.), and 15) Amazing Love Residential Care Services, LLC (Columbus, OH.).

Along with the tax returns and financial statements, the Court also reviewed bank records for the LLC, including an account at JPMorgan Chase Bank, N.A. (Chase) and two accounts at Huntington (business checking and savings). Regarding the Chase account, the Debtors' amended bankruptcy schedules disclose that they and/or Brian have debit card access to and use the account for personal expenses. The Debtors made this same disclosure for the two Huntington accounts.

The period covered by the bank statements start with January 2, 2013, the day after the purported sale of the LLC to Brian, through April 21, 2016, approximately a year after Debtors filed bankruptcy, and two days after the Plaintiff filed this substantive consolidation adversary proceeding on April 19, 2016. The statements reveal that Debtors retained access to the LLC's accounts through debit cards long after the purported sale, and that the Felix family used those accounts for personal expenses, with no regard for corporate boundaries. Purchases, payments and withdrawals in Ohio and Maryland revealed, are of course in addition to the substantial salaries received by Debtors and Brian, as detailed above. In sum, the family enjoyed a lucrative enterprise. Indeed a year before the bankruptcy filing Mr. Felix cashed a $47,000.00 brokerage account with Edward Jones, according to Debtors' Amended Statement of Financial Affairs.

The transactions on the Chase and Huntington accounts, that received substantial deposits from Medicaid, include a wide array of purchases from nationally recognized retailers, restaurants, airlines, cable companies, internet radio stations, satellite television providers, auto clubs, computer companies, grocery stores, fit-

ness clubs, gas stations, liquor stores, vitamin stores, hotels, etc. The Court identified numerous transactions with several nationally-recognized retailers, grocers, theaters, restaurants, service-providers, etc. The stores and theaters included, Macy's, Zale's ($944.63 on January 7, 2013), Lady Foot Locker, Payless Shoes, the Apple Store, TJ Maxx, Best Buy, The Men's Warehouse, Burlington Coat Factory, Dicks Clothing and Sporting Goods, Paul Frederick Shirts, Wal–Mart, Vitamin World, Kroger, 7–ELEVEN, Ikea College, JC Penny, Walgreens, Marshall's, and AMC. There are numerous charges for restaurants such as, Pizza Hut, IHOP, Papa Johns, Little Caesars Pizza, O' Charley's, Pizza Hut, and McDonalds. Service-providers include, Lifetime Fitness, LA Fitness, Shell Oil, Marriott, Hilton Garden Inn, Hilton Select, Time Warner Cable, Direct TV, Wow Cable, Southwest Airlines, Flowerama, Greyhound, AAA Auto Club, Verizon Wireless, and iTunes.

In addition, the transactions include payments to doctors, Mr. Felix's immigration attorney in Maryland ($1,000.00 on March 20, 2014), HOA fees, religious organization contributions, car payments, insurance premiums, credit reporting agency charges, home mortgage payments, auto dealer repairs, utilities, nail salons, school tuition, drivers training schools, alarm companies, and cable bills. Going into further detail for example, starting in January 2013 and up to June 17, 2014, Debtors used the LLC's Chase and Huntington accounts to pay the monthly mortgage payment (approximately $4,600.00) for their second residence, along with the utilities. This home is located in Maryland, and includes 4,607 sq. ft., four bedrooms, and three and a half baths, with an attached garage. In addition, the Debtors used the LLC accounts to pay the HOA fees for this home. Together, all the Chase home mortgage payments made by the LLC total approximately $66,211.37.

The Chase account bank statements also show numerous "ATM and Debit Card Withdrawals" between April 15, 2013 and October 6, 2014, in both Ohio and Maryland. All together, they total approximately $2,930.00. The statements also reflect a cash withdrawal of $4,000.00 on October 4, 2013. In addition, the Chase account bank statements include near monthly payments from January 10, 2013, to August 4, 2015, to the same Reynoldsburg, Ohio Urgent Care Physician that total approximately $6,334.00. Further, the bank statements for the LLC's Huntington and Chase accounts show charges for air travel on Delta, KLM and Southwest Airlines from April 26, 2013 to August 24, 2015, that total approximately $6,302.88.

Remember, the LLC provides home health nursing care services. One reasonably would expect medical supplies, not cable bills, airline tickets, and trips to Lady Foot Locker and Macy's. Reviewing bank transactions for the LLC's Huntington and Chase accounts between January 2, 2013 and April 21, 2016, the Court identified approximately 21 separate charges for Macy's of approximately $2,092.39; Best Buy (18 transactions approximately total $1,057.91); LA Fitness and Lifetime Fitness (35 transactions of approximately $2,334.10). For Best Buy, LA Fitness, and Lifetime Fitness, some of the charges appear on a monthly basis.

On top of the accounts discussed above, the amended bankruptcy schedules disclose a Park National Bank account (Park National) in the name of a "City Medical, LLC", and that the Debtors and/or Brian have debit card access to and use this account for personal expenses. Further, after the bankruptcy filing Mr. Felix opened a personal bank account at Huntington. Mrs. Felix opened an account at

Park National in the name of a "Danmike Investments", and the Debtors both opened personal checking and savings accounts at Park National. Further, on the date of bankruptcy filing, the Debtors had "Global Cash Cards" as a means to receive wages from the LLC. Finally, the amended bankruptcy schedules show that on the date of filing the Debtors held six joint checking accounts with their children at Park National and the Whitehall Credit Union.

Not only did the Felix family use the LLC accounts for personal goods and services, they also used that entity to purchase a 2012 Lexus SUV from Germain Lexus. According to Debtors' amended bankruptcy schedules, they were having difficulty making the monthly payments ($1,271.43). Consequently, in March 2016, approximately a year after filing bankruptcy, they sold this vehicle back to Germain Lexus for $28,000.00, resulting into a net return of $14,100.00, allegedly paid to the LLC. Debtors' amended schedules also disclose a 2003 Honda Pilot driven by an adult daughter, Tiffany Felix. Debtors sold this automobile they owned in September 2015, approximately eight months after filing bankruptcy, to an "unknown person". Debtors also owned a 2007 Lexus driven by another adult daughter, Amanda Felix. According to the amended bankruptcy schedules, Amanda paid the balance due, and Debtors transferred title in March 2016, more than a year after the bankruptcy filing.

Trying to unravel and make sense of 15 years-worth of financial transactions, business and personal relations is difficult under the best circumstances. The burden is heavier in this case, where there is either an inability or unwillingness to disclose, timely and candidly, all the information critical to the collection of assets, and the distribution of proceeds to creditors. Only the extraordinary substantive consolidation route, offers some hope of recovery for the estate and its creditors. Plaintiff proved the requisite disregard of corporate boundaries, failure to respect joint ownership interests, control over assets to the exclusion of all stakeholders, and disarray so substantial that creditors benefit more through substantive consolidation. The following four factors are most persuasive.

First, Plaintiff demonstrated that Debtors used the LLC's accounts at Chase and Huntington to fund their daily living expenses, from mortgage payments, doctor visits, and health club memberships to shopping trips, airline tickets, hotels, and chain restaurants. Rather than funding medical supplies and related purchases, the accounts, that included Medicaid reimbursements, gave the Debtors, their Son Brian and the entire Felix family, a lifestyle the numerous creditors in this case may find enviable.

Second, demonstrating further disregard for the interests of creditors, the Debtors purported to sale the LLC and the underlying business to their Son for between $1,000.00 and $6,000.00, depending upon which agreement you consider. Plaintiff proved at the time of the sale, the LLC generated substantial revenues and continued to do so afterwards, according to tax returns and financial statements. In addition, the tax returns of the Debtors and Brian demonstrate that even after the "sale", Debtors continued to report the LLC's gross receipts/sales as owners, in addition to disclosing the LLC as their only income, as its employees. Even assuming that Brian ever paid for the business, Plaintiff proved that the alleged consideration for the sale is grossly inadequate, and that the Debtors and their Son, through their own actions, never intended a true transfer or change in operations, up to this day. Finally, assum-

ing the validity of the sale, the LLC's creditors are without recourse since the transaction did not include an assumption of liabilities.

Third, as discussed earlier, Debtors' formation of multiple entities, and imprecise use of names of entities on documents and records makes it difficult to trace and unravel transactions through less invasive measures, such as fraudulent conveyance litigation. Between June 2, 2003, with the formation of the LLC, and ending December 9, 2015, with the formation of Winners Homecare, LLC, the Debtors and their family have created 15 medical services-related entities or trade names. The enterprises span the States of Ohio and Maryland, and the District of Columbia, including multiple addresses. The time and effort required to unravel the books and records, trace transactions and looking for value, far outweigh the prospects of recovery using more traditional collection methods.

Fourth, Defendants have failed to establish that substantive consolidation will sufficiently harm their interests and those of other stakeholders. In reaching this conclusion, the Court considered that the LLC provides home health and nursing services through the labor of the Debtors, and that these services will cease upon consolidation. Absent an ongoing business operation, Plaintiff retains only the physical assets, such as used furniture and equipment, motor vehicles and computer software, which all may be subject to the lien of Huntington and others. Indeed, according to the most recent available data, the LLC booked total assets of $64,951.00 and total liabilities of $126,514.00 (July 31, 2016, Balance Sheet for "City Medical Home Health Nursing Services, LLC). The liabilities include delinquent rent of $9,871.00, a loan payable to Huntington of $53,393.00, a note payable to U.S. Bank of $12,056.00, an American Express Business Credit Card payable of $720.00, a note payable to Amanda Felix of $20,000.00, and payroll liabilities of $30,474.00.

Further, the Court considered the facts that to date there are filed claims in excess of $800,000.00, and that substantial legal fees and expenses have accrued, along with statutory trustee compensation. Indeed, Plaintiff acknowledged in his most recent Interim Report that approximately $200,000.00 in administrative expenses have amassed. All these factors will reduce any potential recovery to a consolidated creditor body. Further, the Court recognizes that substantive consolidation eliminates the Debtors' and Brian's only known source of income.

Yet, the behavior of the Defendants in how chaotically they handled and comingled their business and personal affairs, is the root cause of all these difficulties. As discussed, more traditional and less invasive measures are not realistic means of recovery in this case. In addition, assuming the validity of the sale without an assumption of liability, the LLC's creditors have no other recourse. Whatever revenues come from the LLC will be in addition to the net Ohio home sale proceeds already on deposit in the estate ($265,000.00). Further, post-substantive consolidation, Plaintiff may identify additional sources of recovery. There is no guarantee of a creditor distribution with substantive consolidation, but the Court finds on balance that it is the only chance. The actions of Defendants demonstrate that if left to their own devices, they will continue to generate income to fund their lifestyles, while leaving their creditors just that- unpaid. At the core, substantive consolidation is an equitable remedy, and as such, fundamental fairness must prevail.

For all these reasons and immediately effective, the Court **ORDERS AND SUBSTANTIVELY CONSOLIDATES**

all assets, interests and liabilities of City Medical Nursing Center, LLC, with the bankruptcy estates of Austin Chidi and Dorothy Ify Felix. This includes, but is not limited to all their interests in City Medical Nursing Center, LLC, and any other entities or persons through which it has ever conducted business.

**IT IS FURTHER ORDERED THAT** Austin Chidi and Dorothy Ify Felix, and Brian Felix shall fully cooperate with Plaintiff in the implementation of substantive consolidation, as now ordered by the Court.

**IT IS SO ORDERED.**